## DORSEY v. KEMBLE. (No. 9248.)

(Court of Civil Appeals of Texas. Ft. Worth. March 13, 1920. Rehearing Denied April 17, 1920.)

Estoppel ⧉75—Owner who made parol lease not estopped from claiming ownership against innocent mortgagee.

Owner who leased barber shop fixtures by parol for the purpose of being used in the lessee's shop was not estopped from claiming ownership of fixtures as against innocent mortgagee who loaned lessee money on the faith that the fixtures belonged to lessee.

Appeal from District Court, Tarrant County; R. E. L. Roy, Judge.

Suit by A. J. Dorsey against W. S. Kemble and others. Judgment for plaintiff against defendants not named subject to named defendant's claim, and plaintiff appeals. Reversed in so far as judgment favored named defendant; otherwise undisturbed.

Baskin, Eastus & Ammerman and David Greines, all of Ft. Worth, for appellant.

Penry & Penry, of Ft. Worth, for appellee.

BUCK, J. This was a suit brought by A. J. Dorsey against W. H. Larsen, G. W. Prichard, and W. S. Kemble to recover five white enameled barber chairs and other barber fixtures which Dorsey had rented to one E. A. Flatt. Flatt took the chairs and other fixtures out to Camp Bowie in August, 1918. While out there he seems to have mortgaged them to Prichard and Larsen, and also to W. S. Kemble. The mortgage to Larsen and Prichard was given to secure them for their rent. Kemble loaned Flatt $200 in money and took a mortgage on the barber outfit. The cause was submitted on special issues, and the jury found in answer thereto:

"(1) Did the plaintiff, A. J. Dorsey, lease, rent, or sell the property here in controversy to one E. A. Flatt on or about the 1st day of August, 1918, when he delivered the same to the said E. A. Flatt? Answer: Leased.

"(2) What was the reasonable money value, if any, of the barber fixtures in controversy in the barber shop since December 4, 1918, to the present time? Answer: $25 per month. * * *

"(4) After the property in controversy was delivered by Dorsey to Flatt, on or about August 1, 1918, did Dorsey know that Flatt was claiming to be the owner of said property? Answer: No.

"(5) At the time Dorsey put Flatt in possession of the property in controversy did Dorsey know that Flatt intended to operate same in his own name? Answer: Yes.

"(6) At the time Kemble loaned Flatt the $200 did Kemble know that the property wasn't the property of Flatt? Answer: No.

"(7) Did the plaintiff, Dorsey, know that Flatt mortgaged the property in controversy to defendant Larsen and Prichard at the time said mortgage was executed? Answer: No.

---

⧉For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

"(8) At the time Larsen and Prichard took the mortgage on the property in controversy did the said Larsen and Prichard know that the property was not the property of Flatt? Answer: No."

Upon these findings the court entered a judgment that plaintiff have judgment against Prichard and Larsen, but subject to the claim of Kemble. From this judgment the plaintiff has appealed.

Appellant assigns error to the court's action in rendering judgment in favor of W. S. Kemble and against the plaintiff, by the terms of which judgment it was held that plaintiff was estopped from denying Flatt's ownership of the fixtures so far as Kemble's claim was concerned. We are of the opinion that this assignment must be sustained. In answer to question No. 4, submitted in issue, the jury found that after the property in controversy was delivered by Dorsey to Flatt, on or about August 1, 1918, Dorsey did not know that Flatt was claiming to be the owner of said property. In answer to question No. 1 submitted the jury found that Dorsey leased the property to Flatt on or about August 1, 1918. In answer to question No. 5 submitted the jury found that at the time Dorsey put Flatt in possession of the property in controversy Dorsey did not know that Flatt "intended to operate the same in his own name." We understand that by finding No. 5 the jury intended to answer that at the time Dorsey put Flatt in possession of the property in controversy Dorsey did know that Flatt intended to operate the barber business in which he was embarking in his own name. This construction of the answer is supported by the answers to questions No. 1 and No. 2, as well as by the statement of facts. Then we have the question presented: Will an owner of property who rents or leases it to another for use in carrying on a business be estopped from denying such ownership in a suit between said owner and the creditor or mortgagee of such lessee or renter? In the case of Davis v. Washington, 18 Tex. Civ. App. 67, 43 S. W. 585, writ denied, it was held that the fact that chattels used by the tenant were on the rented premises at the time of the execution of a lease to the premises, and had been there prior to that time, will not, of itself, secure to the landlord a lien upon them for rent. In Blum v. Merchant, 58 Tex. 400, E. J. Pietzcker managed a general merchandise store before and after the death of the owner, J. A. Merchant. After Merchant's death Pietzcker continued to operate the store, and Mrs. Merchant and her children, the heirs of J. A. Merchant, knew nothing of the business. A levy was made by the sheriff to satisfy a claim by the Blums, and certain goods were taken therefrom. Mrs. Merchant, joined by her children, brought suit against the Blums and the sheriff. The court says:

"The charge seeks to estop the plaintiffs from claiming the property by reason of some act or neglect on their part which has led others into a course which they would not have pursued but for the conduct of the plaintiffs. The elements of an estoppel are: A false representation, or concealment of material facts, made with a knowledge of the facts; ignorance on the part of the person to whom the representations are made, or from whom the facts are concealed; intention that such person should act upon it, and action on his part induced thereby. No matter what representations were made by Pietzcker himself as to his ownership of the property, if these did not come to the knowledge of plaintiffs, and they did not join in these representations, or fail to deny them when they had an opportunity of preventing others from being deceived by them, they would not be estopped from controverting them at any other time."

See, also, Steed v. Petty, 65 Tex. 490; Bynum v. Preston, 69 Tex. 287, 6 S. W. 428, 5 Am. St. Rep. 49; Mortgage Co. v. Norton, 71 Tex. 683, 10 S. W. 301; Nichols-Steuart v. Crosby, 87 Tex. 443, 29 S. W. 380; 3 R. C. L. pp. 142, 143; 6 Corpus Juris, § 109, p. 1147.

In 10 R. C. L. p. 692, § 21, under the head of "Estoppel," the author says:

"Mere silence will not work an estoppel. There must be some other element connected with the transaction and the silence to prevent a person from asserting his rights or claim. And so, in the many and varied situations in which this question can be raised, it is generally affirmed that in order to work an estoppel the silence must be under such circumstances that there are both a specific opportunity and a real or apparent duty to speak. Or, as otherwise expressed, if a man is silent when he ought to speak, equity will debar him from speaking when conscience requires him to be silent. Silence when there is a duty to speak is deemed equivalent to concealment, or it may amount to the adoption of the statement of another, as where a part owner of personalty makes no objection to his co-owner's statements with reference to the interest of a third person in the property, though he is present when such statements are made and hears and understands them. But to effect an estoppel by silence it must also appear that the person had a full knowledge of the facts and of his rights, that he had an intent to mislead, or at least a willingness that others should be deceived, and that the other party was misled by his attitude."

It is not claimed by appellee in his brief that Dorsey ever made any statement to Kemble, or to any one else, by reason of which Kemble loaned that money to Flatt. The facts found by the jury are not attacked by either appellant or appellee. Hence we have before us the question as to whether the fact that appellant leased by parol the property in controversy to Flatt for the purpose of being used in the latter's shop was such an act as would estop the appellant from claiming his property as against one who had

loaned money on the faith that the property belonged to Flatt. In 10 R. C. L. p. 777, the author says:

"Mere possession and control of personal property is not sufficient to estop the real owner from asserting his title against a person who has dealt with the one in possession on the faith of his apparent ownership. But an estoppel will arise against the real owner where he clothes the person assuming to dispose of the property with the apparent title to it, and when the person setting up the estoppel acts and parts with value or extends credit on the faith of such apparent ownership. Thus, where the owner of a wagon allowed another person to paint his name and business on it, the true owner was held estopped as against a purchaser from the apparent owner. * * * A mere lease of chattels, however, does not confer an apparent ownership, and it has been so held even where the lease was made to a dealer in goods such as those covered by the lease, or to one who used the property in connection with his business."

Appellee relies on the cases of Kempner v. Huddleston, 90 Tex. 185, 37 S. W. 1066; Neale v. Sears, 31 Tex. 105; Holder v. Shelby, 118 S. W. 590; May v. Martin, 32 Tex. Civ. App. 132, 73 S. W. 840. The Kempner v. Huddleston Case was on certified questions from the First district. I. N. Singletary executed two promissory notes to his sister, C. E. Singletary. Each note is dated November 16, 1885, and payable 12 and 24 months after date. Some time in December, 1887, these notes were delivered by the payee to F. M. Huddleston for safe-keeping, as she testified. Afterwards she and Huddleston were married. On February 1, 1889, Huddleston indorsed and delivered the notes to H. Kempner as collateral security for money advanced to Huddleston in cash. At the time of the indorsement of the notes to Kempner each had written thereon the following transfer:

"For value received I hereby transfer the within note to F. M. Huddleston, December 15, 1887.       [Signed] C. E. Singletary."

Mrs. Huddleston testified that she did not sign the transfers, that after their marriage Huddleston told her that during a recent illness of herself he had transferred the notes to himself to enable him to collect them for her children in case of her death, and that afterwards he held possession of them for collection for herself and her children. On the other hand, there was evidence tending to show that the signatures to the transfers were in the handwriting of plaintiff. The Supreme Court held that, if Mrs. Huddleston before her marriage executed the transfer written upon the back of the notes and delivered them to F. M. Huddleston to be by him collected for her, Mrs. Huddleston was estopped to deny the authority of her husband to transfer the notes; that if Huddleston, before his marriage with Mrs. Singletary, received the notes from her for collection, and

without her consent wrote the indorsement upon them by which they were transferred to him and signed her name thereto, and afterwards, before their marriage, informed her that he had made such transfer and signed her name to it, and, being so informed, she permitted him to retain possession of the notes so transferred, then she would be estopped from denying the title to Kempner, who purchased in good faith for a valuable consideration and without notice of any want of title in Huddleston. By leaving the notes in his possession with the indorsement written and her name signed thereto, she ratified the act of Huddleston and made it as binding upon her as if she had actually signed it herself.

The case of May v. Martin, supra, also involved the transfer of a note executed by a married woman while she was a feme sole. One May became the owner of said note and transferred it to one Martin. On the day after such transfer Martin by a separate instrument retransferred the note to May, but retained the notes and original assignment to him. The object of these transactions was to place the apparent title in Martin, in order that he might sue on the note in his own name; it being intended that the beneficial ownership should remain in May. The court said:

"May having voluntarily placed the apparent title to the note in Martin, and the trust company having been induced by the said act of May to make the loan to Martin and accept the note as security therefor, May is estopped from questioning the validity of the pledge, and the trust company is entitled to be protected as an innocent purchaser. Kempner v. Huddleston, 90 Tex. 182, 37 S. W. 1066."

In Neale v. Sears, supra, the controversy was over two billiard tables. Sears and one White owned a billiard saloon, and the partnership dissolved and notice thereof was published in the public press, with the statement that White would continue the business at the old stand. In the same paper, and subsequent issue, appeared an advertisement by White, the other partner, that the saloon, formerly known as the "White House" was now operating as the "El Dorado" saloon, and he invited the public to patronize the place, mentioning their choice liquors, billiard tables, etc. It appears that Sears was really the owner of the two billiard tables, but which he permitted White to retain in the saloon, and to advertise as if the whole establishment, including the tables, was the property of White. The Supreme Court, in a controversy between Sears and White's creditors, held that Sears was in reality the owner of the property, but placed the same in the possession of White, who publicly proclaimed himself the owner, or what was equivalent. "Because Sears tacitly assented to the assumed ownership of the property by White, and thereby induced Neale to loan money to

White upon the security furnished by this property, he is legally and equitably precluded from asserting his ownership to the detriment of Neale, who appears an innocent purchaser."

It will be noted that through an advertisement signed by both the partners, Sears and White, it was stated that Sears had sold out to White and White would conduct the business in the future. This was tantamount to a statement that he bought all of the partnership effects necessary to conduct the business. The Supreme Court held that, having made this statement, Sears was estopped from denying that he had sold the billiard tables to White.

We believe that each of the cases cited by appellee is distinguishable from the present case, and that the court erred in giving a judgment in favor of Kemble. For which reason the judgment will be reversed as to the issue between Dorsey and Kemble, and here rendered for appellant. Otherwise the judgment below will be undisturbed.